# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 20-1037T
(Filed: October 10, 2023)

| | |
|---|---|
| **RAMON D. BANEY** and **MARION D. BANEY**, *Plaintiffs*, v. **UNITED STATES**, *Defendant*. | ) ) ) ) ) ) ) ) ) ) ) |

*Ramon D. Baney* and *Marion D. Baney*, Braitling, Northern Territory, Australia, pro se.[1]

*Steven M. Chasin*, Trial Attorney, Court of Federal Claims Section, Tax Division, U.S. Department of Justice, Washington, D.C., for defendant. With him on the briefs were *David A. Hubbert*, Deputy Assistant Attorney General, and *David I. Pincus*, Chief, and *Mary M. Abate*, Assistant Chief, Court of Federal Claims Section, Tax Division, U.S. Department of Justice, Washington, D.C.

**OPINION AND ORDER**[2]

***BONILLA, Judge***.

This tax refund suit involves two amended United States federal income tax returns filed by expatriate Ramon D. Baney and his Australian-citizen spouse, Marion D. Baney. After disclaiming a foreign earned income exclusion in a series of Internal Revenue Service (IRS) Closing Agreements–electing to pay income taxes in

---

[1] From the filing of this action on August 19, 2020, through the close of discovery on June 2, 2023, plaintiffs were represented by counsel. Following the court-sanctioned withdrawal of counsel, plaintiffs elected to proceed pro se.

[2] This case was transferred to the undersigned for adjudication on February 28, 2022, pursuant to Rule 40.1(b) of the Rules of the United States Court of Federal Claims (RCFC). Briefing on the dispositive cross-motions decided herein continued through the filing of this Opinion and Order. Further briefing and oral argument were deemed unnecessary.

the United States rather than Australia–the Baneys sought successive refunds in an effort to eliminate their tax liability altogether.  Their tax year 2016 attempt was successful, resulting in a refund in the amount of $17,813.13.  The couple's tax year 2017 effort–seeking a refund in the amount of $17,003–was not.

The Baneys filed suit in this Court challenging the IRS's disallowance of their amended 2017 tax return.  The United States answered with two counterclaims, seeking to recoup the tax year 2016 refund as well as an additional $10,892 attributed to the Baneys' alleged double counting of a real estate tax deduction in their original and amended 2017 tax return.  Pending before the Court are the parties' cross-motions for summary judgment pursuant to RCFC 56.  For the reasons set forth below, plaintiffs' motion for partial summary judgment (ECF 56) is DENIED and defendant's cross-motion for summary judgment (ECF 57) is GRANTED.

## BACKGROUND

Ramon Baney is a United States citizen and a retired United States Air Force veteran with more than twenty years of military service.  His spouse, Marion Baney, is an Australian national and former permanent resident of the United States.  In late 1995, while stationed at Hickam Air Force Base (n/k/a Joint Base Pearl Harbor–Hickam) in Oahu, Hawaii, Mr. Baney accepted a position as an engineer/senior systems controller with TRW, Inc.–a United States Department of Defense contractor at the Joint Defense Facility Pine Gap (Pine Gap) near Alice Springs, Australia.  The original job offer was for a renewable two-year expatriate assignment.  At all relevant times, Mr. Baney continued this employment and Mrs. Baney was retired.

Prior to the Baneys' 1996 relocation to Australia, TRW required Mr. Baney to execute a U.S. Treasury Department–Internal Revenue Service Closing Agreement as to Final Determination Covering Specific Matters (hereinafter Closing Agreement) under Internal Revenue Code (I.R.C.) § 7121.  ECF 57-3 at 2–7.  In executing the Closing Agreement, Mr. Baney waived his right to elect a foreign earned income exclusion under I.R.C. § 911 in preparing and filing his United States federal income tax returns for tax years 1996 through 1998.  In exchange for his agreement to pay United States federal income taxes on his TRW-earned salary, Mr. Baney would not be concomitantly subject to the foreign resident income tax assessed by the Commonwealth of Australia, progressively ranging from 32.5 to 45 percent.

In 2002, Northrop Grumman Corporation (Northrop Grumman) acquired TRW and required that Mr. Baney continue executing Closing Agreements every two years as a condition of his contract extensions and continuing employment.  Throughout his tenure with TRW/Northrop Grumman, Mr. Baney executed at least ten Closing

Agreements covering tax years 1996 through 2019.[3] ECF 57-3 at 2–7; ECF 57-5 at 2–51. Relevant here, on October 26, 2015, Mr. Baney executed a Closing Agreement covering tax years 2015 through 2017. ECF 57-5 at 42–47. In waiving and foregoing his right to claim the § 911 foreign earned income exclusion–and agreeing to pay United States federal income tax in lieu of the Australian foreign resident income tax–Mr. Baney formally declared, among others things, he read and fully understood the Closing Agreement, voluntarily signed it, and recognized the contract was "necessary to receive an . . . exemption from Australia[n] tax and the related exemption from Australian tax installment deductions." *See* ECF 57-5 at 47. The Closing Agreement was thereafter executed by Acting Director, IRS Treaty Administration Jennifer Best on May 13, 2016. *Id.* at 46.

The Baneys filed their original Form 1040 U.S. Individual Income Tax Returns (married filing jointly) for tax years 2016 and 2017 on January 25, 2017 and February 14, 2018, respectively.[4] Consistent with the October 26, 2015 Closing Agreement, the Baneys reported Mr. Baney's total Northrop Grumman salary and did not elect the foreign earned income exclusion under § 911 or file a Form 2555 (Foreign Earned Income). For tax year 2016, the Baneys received a tax refund in the amount of $1,645. ECF 57-15 at 4. In their tax year 2017 filing, the Baneys reported $32,457 in losses from the sale of rental property on Form 4797 (Sales of Business Property). ECF 57-17 at 2, 15. The reported losses contributed to the Baneys' 2017 tax refund in the amount of $20,895. *Id.* at 4.

On December 8, 2017 and August 2, 2018, the Baneys filed successive Form 1040X Amended U.S. Individual Income Tax Returns for tax year 2016, "claiming the foreign earned income exclusion" for Mr. Baney's Northrop Grumman earnings and a resulting additional refund in the amount of $16,868.[5] ECF 57-18 at 2–4 (alteration to capitalization); ECF 57-19 at 2–4 (same). On September 17, 2018, the IRS remitted to the Baneys a tax refund in the amount of $16,868, plus $945.13 in interest.

In the interim, on July 20, 2018 and January 2, 2020, the Baneys filed successive Form 1040X Amended U.S. Individual Income Tax Returns for tax year

[3] For clarity, throughout the years, the Closing Agreements refer to Northrop Grumman subsidiaries Northrop Grumman Space Technology International Inc., Northrop Grumman International Inc., Northrop Grumman Aerospace International Inc., and Northrop Grumman Corporation International Inc. *See* ECF 57-5 at 14–51. Although not material to this decision, the record does not include a Closing Agreement covering tax year 2014.

[4] For clarity, the Court uses the signature dates on plaintiffs' federal income tax returns for the filing dates.

[5] Unlike their amended 2017 federal income tax return, *see infra* note 6, although the entries are not identical, the record presented is not clear why the Baneys twice amended their 2016 federal income tax returns.

2017, similarly "claiming the foreign earned income exclusion" for Mr. Baney's Northrop Grumman earnings and an additional refund in the amount of $17,003.[6] ECF 57-20 at 2–5 (alteration to capitalization); ECF 57-21 at 2–7 (same). This time, by letter dated April 28, 2020, the IRS disallowed the Baneys' amended tax return, explaining: "The closing agreement that you entered into with the Internal Revenue Service provides that you irrevocably waived any right you had to make any election under section 911(a) of the IRC." ECF 1-4 at 2, 4.

The Baneys' commenced this action on August 19, 2020, challenging the IRS's disallowance of their amended 2017 tax return and claiming a refund in the amount of $17,003, plus interest. Answering the complaint, the United States asserted a counterclaim seeking to recover the 2016 tax refund remitted to the Baneys in the amount of $17,813.13 (i.e., $16,868, plus $945.13 in interest).[7] Thereafter, in the course of discovery, the government reportedly uncovered the Baneys double counted their rental property losses in 2017, resulting in an erroneous tax refund in the net amount of $10,892. By leave of the Court, the United States filed a second counterclaim seeking to recover the overpayment. In total, the government seeks to recover $28,705.13, plus interest.

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A "genuine dispute" exists where a reasonable factfinder "could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts," in turn, are those "that might affect the outcome of the suit." *Id.* In deciding motions for summary judgment, particularly where, as here, the parties filed cross-motions for partial and full summary judgment, the Court must draw all inferences in the light most favorable to the nonmoving party, evaluating each motion on its own merits. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323

[6] The January 2, 2020 filing was necessitated by the Baneys' failure to sign the July 20, 2018 tax forms. *See* ECF 1-4 at 7 (IRS summary); *compare* ECF 57-20 at 3 (unsigned amended tax return) *with* ECF 57-21 at 3 (signed amended tax return).

[7] According to the government, the Baneys received similar retroactive refunds for tax years 2014 and 2015. Defendant concedes the earlier tax refunds fall outside the applicable statute of limitations and, therefore, no similar counterclaims are asserted in this civil action.

(1986). That burden can be met by showing "there is an absence of evidence to support the nonmoving party's case." *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex*, 477 U.S. at 325). "Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citing *Anderson*, 477 U.S. at 248). Summary judgment is warranted when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

## II. Closing Agreements

The United States Tax Court recently examined the validity and enforceability of Closing Agreements in a factually indistinguishable case, *Smith v. Commissioner of the Internal Revenue Service*, 159 T.C. 3, No. 5191-20, 2022 WL 3654871 (T.C. Aug. 25, 2022), *appeal docketed*, No. 23-1060 (D.C. Cir. Feb. 23, 2023).[8] In *Smith*, the Tax Court exhaustively addressed four principal questions presented here, concluding: (1) Closing Agreements are valid and enforceable interpretations of the governing treaty between the United States and Australia; (2) the Director of the IRS Treaty Administration possesses the requisite (delegated) authority to enter into Closing Agreements on behalf of the IRS Commissioner as the designated representative of the United States Secretary of the Treasury; (3) United States government contractors may require prospective and current employees to execute Closing Agreements as conditions of their employment and facilitate their execution on behalf of the IRS; and (4) claims of government malfeasance (i.e., material misrepresentations and duress) with regard to the execution of Pine Gap Closing Agreements were unfounded. *Id.* at *10–26.

In this case, the Baneys assert nearly identical arguments to those advanced in *Smith*, seeking to avoid paying income tax on Mr. Baney's Northrop Grumman salary to either the United States government, in accordance with his duly executed Closing Agreements, or to the Australian government in the absence of such

[8] The plaintiff in *Smith*, an Air Force veteran and engineer, worked at Pine Gap as an independent contractor for the Raytheon Company (n/k/a Raytheon Technologies). *See* 2022 WL 3654871, at *7. As a condition of his employment, and throughout his tenure–including tax years 2016 through 2018– Mr. Smith signed Closing Agreements waving and foregoing the foreign earned income exclusion and agreed to pay United States income tax on his salary rather than Australian foreign resident income tax. *Id.* at *1, 7–9. In his original United States income tax returns for tax years 2016 and 2017, Mr. Smith did not claim the foreign earned income exclusion under § 911. *Id.* at *9. Despite his initial compliance with the Closing Agreement, Mr. Smith later filed amended federal income tax returns for 2016 and 2017, claiming the foreign earned income exclusion to avoid paying income taxes in both the United States and Australia. *Id.*

agreements.[9] Since *Smith* is directly on point and persuasive, the Court adopts its principal findings and legal conclusions in summarily rejecting the Baneys' claims. The balance of this section addresses arguments advanced by the plaintiffs in this case not directly addressed in *Smith*.

As an initial matter, the Baneys' assertion that Pine Gap Closing Agreements are not binding contracts because they lack an offer and mutual exchange of consideration is frivolous. By statute, "[t]he Secretary [of the Treasury] is authorized to enter into an agreement in writing with any person relating to the liability of such person (or of the person or estate for whom he acts) in respect of any internal revenue tax for any taxable period." 26 U.S.C. § 7121(a). As such, Courts have universally accepted Closing Agreements as enforceable contracts. *See Marathon Oil Co. v. United States*, 42 Fed. Cl 267, 274 (1998) ("Closing agreements are authorized, and limited by, the language of [section 7121] . . . . But closing agreements are contracts nonetheless."), *aff'd*, 215 F.3d 1343 (Fed. Cir. 1999) (table) (per curiam); *see also United States v. Nat'l Steel Corp.*, 75 F.3d 1146, 1150 (7th Cir. 1996) ("[Closing Agreements] certainly are contracts in the ordinary legal sense of the term, because they contain binding promises. The government does not claim to be free to walk away from a closing agreement, and it certainly does not acknowledge the right of a taxpayer to do so.").

Next, the Baneys assert the Acting Director of the IRS Treaty Administration lacked the requisite authority to sign the Closing Agreement at issue. In *Smith*, the Tax Court held the Director of the IRS Treaty Administration was specifically delegated this express authority. *See* 2022 WL 3654871, at *12 ("Delegation Order 4-12 granted the Director, Treaty Administration, the authority to act as 'competent authority' under the tax treaties with respect to specific applications of such treaties, including the authority to sign 'other agreements' on behalf of the Commissioner."). The sole difference between *Smith* and this case is the IRS official who signed the contested Closing Agreement here served in an acting capacity as opposed to a permanent appointment. As the Tax Court later explained in addressing a similar issue, it is the substantive *role*–and not necessarily the *title*–that governs. *See Aubin v. Comm'r of Internal Revenue Serv.*, No. 1814-20, 2023 U.S. Tax Ct. LEXIS 2631, at *2–10 (June 8, 2023) (examining validity of Closing Agreement covering tax years 2015 through 2017 signed by a Northrop Grumman employee at Pine Gap). Simply put, the fact that Director Best was in an acting role is of no moment. There is nothing in the record suggesting she did not perform the same duties or possess the

[9] Of note, plaintiff's counsel in *Smith* served as the Baneys' former counsel in this case, and the arguments advanced here are largely recycled.

same delegated authorities in her acting capacity.[10]  Accordingly, the Court concludes Acting Director Best had the requisite (delegated) authority to serve as the competent authority to sign Closing Agreements.

*Aubin* further instructs on plaintiffs' malfeasance arguments: the Tax Court summarily rejected the plaintiff's duress and coercion arguments as they related to malfeasance since the Closing Agreement at issue was the fourth plaintiff signed in almost a decade, allowing him "much time to reflect" upon Northrop Grumman's employment condition.  *Id.* at *13.  This pales in comparison with the *ten* Closing Agreements Mr. Baney executed over twenty years.  Relying on *Smith*, the Tax Court also rejected the *Aubin* plaintiff's arguments that the Closing Agreement's recitation of United States' and Australian treaty law qualified as a misrepresentation of material fact.  *Id.* at *24–27.  While the *Aubin* Tax Court declined to rule on the plaintiff's waiver argument–the same theory espoused by the Baneys–*Aubin* concluded that, even if correct, the plaintiff's proposal did "not provide him grounds to disavow the agreement he signed."  *Id.* at *27.  The same is true in this case.[11]

Finally, plaintiffs cite Ms. Baney's failure to sign the Closing Agreement for the relevant tax years as rendering it void or otherwise unenforceable.  Specifically, the Baneys point to the blank signature line above "Spouse's signature (if a joint return elected)" on the Closing Agreement executed by Mr. Baney on October 26, 2015, for tax years 2015 through 2017.  *See* ECF 57-5 at 46.  Counterbalancing the absence of Mrs. Baney's signature on *this* document are the following facts: Mrs. Baney intermittently signed at least six (of the ten total) Closing Agreements between 1996 and 2018, electing and thereby agreeing to pay United States federal income tax (rather than Australian foreign resident income tax) on Mr. Baney's Northrup Grumman salary throughout this twenty-year period (i.e., tax years 1996

---

[10] In *Aubin*, the Tax Court considered whether the Acting Assistant Deputy Commissioner (International) had the requisite authority to sign the plaintiff's Closing Agreement under Delegation Order 8-3.  *See* 2023 U.S. Tax Ct. LEXIS 2631, at *2–10.  Notably, the Tax Court's analysis focused on whether the IRS Assistant Deputy Commissioner (International) was authorized to serve as the competent authority to sign the Closing Agreement.  In doing so, the court took for granted the official in this role–in their *acting* capacity–exercised the same authorities.  The import of *Aubin*'s analysis is that it is the role which defines delegated authorities.  This Court agrees.

[11] *Aubin* further rejected the plaintiff's argument that the government committed malfeasance in disclosing the Closing Agreement (i.e., taxpayer information) to Northrop Grumman and using the corporation as an intermediary to execute the agreement, explaining: (1) informing an employer of a class requirement does not disclose protected information, and (2) the "establishment of [such an] . . . agency relationship would not have involved the disclosure of return information by the IRS to Northrop Grumman."  *See* 2023 U.S. Tax Ct. LEXIS 2631, at *20–32.  The Court adopts these findings and conclusions in similarly rejecting the Baneys' unsupported claims of malfeasance.

through 2019).[12] Included in this list is the Closing Agreement executed by both Mr. and Mrs. Baney on January 23, 2018, covering tax years 2017 through 2019. ECF 57-5 at 48–51. Although the version in the record bears only the stamp of the Director of the IRS Treaty Administration and is neither signed nor dated by the government official, *see id.*, the Closing Agreement nevertheless reflects Mrs. Baney's ratification of the prior Closing Agreement for tax year 2017.[13] In turn, Mr. Baney–who was employed by Northup Grumman and whose salary was taxed–duly executed each Closing Agreement throughout this twenty-year period.[14] *See* ECF 57-3 at 2–7; ECF 57-5 at 2–51.

Consistent with the substantively identical biannual Closing Agreements, the Baneys' original Form 1040 U.S. Individual Income Tax Returns (married filing jointly) for tax years 2016 and 2017 reported Mr. Baney's total Northrop Grumman salary and did not elect the foreign earned income exclusion under § 911 or include a Form 2555 (Foreign Earned Income). In signing (and filing) these tax returns under penalty of perjury, the Baneys implicitly acknowledged their rights and obligations under the Pine Gap Closing Agreements. Thus, Mrs. Baney's failure to sign the Closing Agreement executed by Mr. Baney on October 26, 2015, did not void or otherwise invalidate the agreement.

At bottom, the Baneys are not entitled to claim the foreign earned income exclusion under § 911 regarding Mr. Baney's Northrup Grumman salary during the relevant tax years. The Baneys consequently received an erroneous refund in the amount of $17,813.13 for tax year 2016, and the IRS properly disallowed the Baneys' amended tax return for tax year 2017. Defendant is, therefore, entitled to recover the erroneous tax refund plus interest.[15]

---

[12] Specifically, Mrs. Baney signed Closing Agreements covering tax years 1996 through 2003, 2007 through 2009, 2011 through 2013, and 2017 through 2019. *See* ECF 57-3 at 2–7; ECF 57-5 at 2–13, 26–30, 37–41, 48–51. She did not sign the Closing Agreements covering tax years 2004 through 2006, 2010, and 2014 through 2016. *See* ECF 57-5 at 14–25, 31–36, 42–51. Of note, the biannual Closing Agreements–each covering three tax years–overlap, resulting in circumstances where Mrs. Baney inconsistently executed an earlier or later Closing Agreement date range. For example, Mrs. Baney signed the Closing Agreement for tax years 2001 through 2003 but did not then sign the Closing Agreement for tax years 2003 through 2004. *Compare* ECF 57-5 at 8–13 *with id.* at 14–19.

[13] The Baneys filed their original Form 1040 U.S. Individual Income Tax Return for tax year 2017 on February 14, 2018, just three weeks after both Mr. and Mrs. Baney executed a Closing Agreement covering tax years 2017 through 2019. *Compare* ECF 57-17 at 2–5 *with* ECF 57-5 at 48–51.

[14] *But see supra* note 3 (tax year 2014 not reflected in Closing Agreements included in the record).

[15] The IRS remitted the erroneous tax refund in the amount of $17,813.13 (i.e., $16,868, plus $945.13 in interest) on September 17, 2018. *See* ECF 57-14 at 3. In answering the complaint on August 28, 2020, defendant filed a formal counterclaim seeking to recover this amount plus interest. *See* ECF 8 at 9–13. Consequently, defendant's civil action was timely filed consistent with 26 U.S.C. § 7405(b) (discussed in Section III *infra*).

## III. Rental Property Loss

The Court now turns to defendant's second counterclaim, alleging the Baneys double counted losses on their rental property in tax year 2017. For the reasons set forth below, the Court finds defendant is entitled to recover the erroneous tax refund remitted to the Baneys related to the 2017 sale of this investment property.

On November 14, 2013, the Baneys purchased an investment property in Alice Springs, Australia. Over the next four years, the Baneys claimed a total of $32,055 in depreciation on their Schedule E (Supplemental Income and Loss), Form 1040, Form 4562 (Depreciation and Amortization), and Form 8582 (Passive Activity Loss Limitations) as follows: $7,837 (2014), $9,476 (2015), $9,476 (2016), and $5,266 (2017). ECF 57-29 at 10, 18, 22; ECF 57-30 at 5, 9; ECF 57-15 at 11, 15–17; ECF 57-17 at 11, 25. The Baneys sold the investment property on July 31, 2017, reportedly at a loss of $32,256. *See* ECF 57-17 at 15. For tax year 2017, the Baneys filed a Form 4797 (Sales of Business Property), wherein they claimed two losses totaling $32,457 related to the single sale of their investment property: $32,256 representing the difference between the original purchase price plus capital improvements ($266,256–i.e., their original basis in the property) and the gross sale proceeds ($234,000); and an additional $201 accounting for the delta between the aggregate depreciation ($32,256) and the depreciation deductions claimed to date ($32,055). *Id.*

Because the Baneys already depreciated a total amount of $32,256 in tax years 2014 through 2017, the maximum deductible loss attributable to the sale was limited to the $201 in diminished value not already deducted. The inclusion of the double counted loss–i.e., the depreciation deducted between 2014 and 2017 *and* the gross capital loss at the time of sale (not accounting for their *actual* adjusted basis based on the depreciation deducted)–artificially inflated the Baneys' 2017 federal income tax refund. Backing out the improperly claimed real estate investment loss from the Baneys' 2017 income (and adjusted gross income) reduces their original refund by $10,892 (i.e., $20,895 – $10,003 = $10,892).[16] Since the Baneys received the $20,895 refund for tax year 2017, *see* ECF 57-16 at 3, they received an erroneous refund (overpayment) in the amount of $10,892.

Before entering judgment in favor of defendant for the overpayment, the Court must determine whether the government's counterclaim is timely. To recover an erroneous tax refund, by statute, the IRS typically has two years from the date of payment to file suit against the taxpayer. *See* 26 U.S.C. § 6532(b). The statute of limitations is extended to five years "if it appears that any part of the refund was

[16] Increasing the Baneys' taxable income by $32,256 increases their total tax for 2017 from $56,885 (using their original effective tax rate of ~22.99%) to $66,888 (using their newly calculated effective tax rate of ~23.91%). Subtracting the federal income withheld documented in Mr. Baney's three 2017 Form W-2s ($77,780), *see* ECF 57-17 at 7, 9, 28, nets a refund in the amount of $10,003.

induced by fraud or misrepresentation of a material fact."[17]  *Id.*  In this case, the record is clear.  In their 2017 Schedule E (Supplemental Income and Loss), Form 1040, the Baneys claimed a loss of $32,256 from the sale of their investment property.  In doing so, they misrepresented (by omission) their claimed deductions between tax years 2014 and 2017.  Indeed, the depreciation deducted to date should have been included in the Baneys' 2017 Form 4797 (Sale of Business Property), Part I(2)(e) in the "Rental Unit" entry, which would have canceled out the claimed $32,256 loss.  *See* ECF 57-17 at 15 ("Depreciation allowed or allowable since acquisition.").  Instead, the Baneys left this box blank, resulting in the double counting of the claimed amount (i.e., depreciation deducted between 2014 and 2017 *and* gross capital loss claimed post sale).  *See id.*  Consequently, the IRS is entitled to the additional three years to "independently discover facts that contradict the return."  *See United States v. N. Tr. Co.*, 372 F.3d 886, 889–90 (7th Cir. 2004).

The IRS remitted the erroneous tax refund at issue on March 5, 2018.  *See* ECF 57-16 at 3.  As noted above, defendant filed a counterclaim seeking to recover the $10,892 overpayment on February 22, 2023.  ECF 42-1 at 13–14.  Consequently, defendant's legal claim was timely filed within the applicable five-year statute of limitations.  Defendant is thus entitled to recover the erroneous tax refund remitted to the Baneys in the amount of $10,892, plus interest.[18]

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for partial summary judgment (ECF 56) is **DENIED** and defendant's cross-motion for summary judgment (ECF 57) is **GRANTED**.  The Clerk of Court shall **ENTER Judgment** in favor of the United States in the amount of $28,705.13 plus interest.

Costs to defendant.

---

[17] Titled "Suits by United States for recovery of erroneous refunds," § 6532(b) provides in full:

> Recovery of an erroneous refund by suit under section 7405 shall be allowed only if such suit is begun within 2 years after the making of such refund, except that such suit may be brought at any time within 5 years from the making of the refund if it appears that any part of the refund was induced by fraud or misrepresentation of a material fact.

26 U.S.C. § 6532(b).

[18] In their response to defendant's cross-motion for summary judgment, plaintiffs do not address this issue.  During written discovery and in their deposition testimony, moreover, plaintiffs concede they only owned one investment property from which the claimed income tax deductions in the form of depreciation and then capital loss arose.

It is so **ORDERED**.

Armando O. Bonilla
Judge